IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86125-5-I |
| Respondent, | |
| v. | DIVISION ONE |
| SHAYNE CURTIS BAKER, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — Scott Pullen was shot and killed at a storage facility in Everett when he encountered a person who was in his friend's parked vehicle, later identified as Shayne Baker. Baker was convicted of felony murder in the first degree, murder in the second degree, two counts of robbery in the first degree, assault in the first degree, and theft of a motor vehicle. On appeal, he raises multiple claims, including an erroneously issued first aggressor instruction, prosecutorial misconduct, the court's commenting on the evidence, insufficient evidence for felony murder, denial of his request for an instruction regarding testimony of an accomplice, and cumulative error. In the alternative, he argues this court should reverse and remand for resentencing because his two murder convictions violate his right to be free from double jeopardy.

We agree the two murder convictions constitute double jeopardy. Accordingly, we reverse the conviction for murder in the second degree and the related firearm enhancement and remand for resentencing consistent with this opinion. Otherwise, we affirm.

BACKGROUND

I.  The Shooting

Raymond Giannini rented a storage unit at Storehouse Mini Storage (Storehouse) in Everett in May 2022. Giannini knew another individual who also rented a unit at Storehouse, Rob Boone. Boone asked Giannini to be "in charge of his vehicle," a Dodge Durango, while he was out of town.

In the late evening of May 2, 2022, Giannini met with Scott Pullen, a friend of Boone's, to gather pallets from local businesses. Giannini left his vehicle, a Chevrolet Tahoe, near Boone's Durango in the Storehouse parking lot. Giannini kept the keys to Boone's Durango in the console of his Tahoe.

Giannini and Pullen returned to Storehouse at around 6:13 a.m. on May 3. As they pulled into the parking lot, Giannini noticed that the Tahoe's door was slightly ajar. When Giannini approached the Tahoe, he saw the stereo was pulled out and the car had been rifled through. He also found a "young kid" sleeping in the passenger seat of the car and confronted him, stating, "What the fuck are you doing here?" and "Wake the fuck up." The young man woke up, immediately apologized, and ran away.

Meanwhile, Pullen approached Boone's Durango and yelled, "There's another one over here." Giannini approached and found a person emerging from the Durango with a backpack in his hands. Pullen and Giannini confronted the person, a young man, and demanded the backpack. The young man then backed away from Giannini and Pullen, but Giannini grabbed the backpack. Giannini testified that the person did not say anything to him or Pullen during the interaction, but he made a motion "like he had something in his . . . breast pocket or something."

2

Pullen continued to walk toward the young man, and Giannini walked toward Pullen's truck for a moment before walking back around toward the young man. According to Giannini, it appeared that Pullen wanted the young man to empty his pockets. While Giannini was observing the interaction, he lost sight of the young man, suddenly heard a gunshot, and saw Pullen fall to the ground partially underneath the passenger side of Pullen's truck, which was between the Tahoe and Durango.

In response, Giannini ducked on the passenger side of the Tahoe and did not see the shooter again until the young man entered the Tahoe on the driver's side. The young man then pointed the gun at Giannini, who ducked. The young man started the vehicle—even though the keys to the Tahoe were with Giannini—and eventually drove away. Giannini called the police, who arrived a short time later. Pullen died on the scene.

II. Police Investigation

Police reviewed video surveillance footage from Storehouse and the surrounding areas. In the footage, the young man who shot Pullen appeared thin and tall; he wore a black sweater, a hat, a bandanna, brown boots with yellow laces, and jeans. The video also shows a second individual with dark hair wearing a dark hoodie, jeans, and white shoes. Other cameras captured the two walking from Storehouse to a nearby Shell gas station and then returning. Around 5:57 a.m., Storehouse footage showed the young man using the red gas canister to fill Giannini's Tahoe with gas. In the footage, the young man did not have a backpack before entering the Durango. Footage also corroborated that Giannini and Pullen confronted the young man around 6:14 a.m., shortly after they arrived, pulled a backpack away from him, and followed him around

3

the Tahoe. The footage did not capture the shooting directly but shows the young man walking backwards, drawing a gun, and firing. The young man then ran to the Tahoe and drove away.

On the day of the shooting, police later saw someone walking near the scene of the crime who was "wearing the same clothes, shoes, and had the same appearance" as the second individual in the footage. This person was later identified as Eli Castro. Police contacted Castro, who was walking with another individual, Nathaniel Long. Long refused to speak to the police. During their investigation, officers ruled out Long as a suspect because his attributes were inconsistent with the shooter in the footage: he was too short, had a distinctive star tattoo on his face, and had long hair in a ponytail.

Castro initially told the police he had prowled cars with a person named "Shane Dahl" on the evening of the shooting. Police investigated a "Shane Dahl" from Washington, who had an outstanding warrant and was on probation. The police followed leads relating to Dahl but ultimately did not find any police reports indicating prior encounters in Snohomish County and did not appear to pursue Dahl as a suspect further. Castro also indicated that the "Shane" he was with on the evening of the shooting could have either been "Shane McDougal" or "Shane Goodall."

During the police's second interview of Castro on June 23, 2022, Castro mentioned that Shane's last name was "Baker." At that time, a detective provided Castro with a photo montage that included an image of Baker. Castro identified Baker as the person he was with the morning of the shooting.

Additionally, around 10 a.m. the morning of the shooting, officers learned that Giannini's stolen Tahoe had been abandoned in south Seattle at State Route 99 and

4

the First Avenue bridge. A partial fingerprint recovered from a gas can inside the Tahoe matched Baker's fingerprint. Interior swabs of the Tahoe's driver's side door generated a mixed sample DNA profile. Kate Zopolos, a forensic scientist with the Washington State Patrol Crime Laboratory, concluded there "was moderate support for the inclusion of Shayne Baker as a possible contributor to [the] profile." Zopolos also tested the Tahoe's steering wheel cover and concluded that the DNA was consistent with four contributors but there was "very strong support of the inclusion of Shayne Baker as a possible contributor to [the DNA] profile."

The State charged Baker with felony murder in the first degree, murder in the second degree, two counts of robbery in the first degree, assault in the first degree against Giannini, and theft of a motor vehicle.

## III. Trial

Castro testified at trial. He testified that he had been walking around Storehouse with Baker the morning of the shooting, breaking into cars to see if there were items of interest to take. Castro stated that he knew Baker as a friend for about "two years." He also testified that while at Storehouse, he and Baker had walked to a Shell gas station nearby to fill a gas canister Baker retrieved from an "all-black BMW trunk." Castro confirmed that after they returned from Shell, he had fallen asleep in a vehicle and was then startled awake by someone opening the door and shouting at him. He also confirmed that he ran away after the encounter. On cross-examination, Castro acknowledged that during his second interview with police, detectives threatened him

5

with more serious charges if he did not provide "Shane's" last name, and that in exchange for his testimony, he received immunity for a vehicle prowling charge.[1]

Additionally, the State introduced testimony and bodycam footage from a police officer who had contact with Baker a few days before the shooting, on April 29, 2022. Officer Storm Hendrix with the Everett Police Department had initiated contact with Baker and recalled that he was wearing a "black baseball cap, a black sweatshirt, a dark shirt underneath, blue or, like, light grayish-blue pants, and . . . work boots that were brown, kind of, like, weathered on the sides and the top, with yellow laces that were halfway laced up." The evidence included stills from Hendrix's bodycam footage that matched this description. During Hendrix's contact with Baker, Baker told Hendrix that all of his clothes were otherwise gone. The State also introduced photos of the young man from the Storehouse incident as a comparison.

The court granted Baker's requested self-defense instruction. Over Baker's objections, the State requested and the court issued a first aggressor instruction as well. The court declined to give Baker's proposed instruction on testimony of an accomplice, as it determined Castro was not an accomplice to the charged crimes. Baker successfully requested inferior degree offense instructions for murder in the second degree (first degree manslaughter) and assault in the first degree (second degree assault). The jury found Baker guilty on all counts.

The court did not include Baker's conviction for murder in the second degree in his offender score, finding it was "the same criminal conduct" as the conviction for felony murder in the first degree. However, the court imposed a 120-month firearm

---

[1] Castro testified that he would not "get in trouble for anything related to this case." He also agreed that he had "transactional immunity for vehicle prowl" for providing testimony.

enhancement on both the convictions for felony murder in the first degree and murder in the second degree.[2] The court dismissed the robbery conviction underlying the felony murder, as it merged with the felony murder conviction. Baker timely appeals.

DISCUSSION

Baker challenges his convictions on several grounds. First, he challenges the sufficiency of evidence to support his felony murder conviction. He also challenges the court's issuing the first aggressor instruction and denial of his request for a cautionary accomplice testimony instruction relating to Castro's testimony. Additionally, he raises claims of prosecutorial misconduct, inappropriate comment on the evidence, and cumulative error. Finally, he claims his convictions for felony murder in the first degree and murder in the second degree constitute double jeopardy. We address each claim in turn.

I.  Sufficiency of Evidence for Felony Murder in the First Degree

Baker argues the State did not present sufficient evidence to prove felony murder in the first degree because the State failed to show "an intimate connection between the killing and the forcible taking." He argues that the shooter "plainly abandoned his original criminal activity related to the Tahoe," and "[t]his broke the chain of events, and his prior act of filling up the Tahoe is immaterial."

Due process requires the State to prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). To determine whether sufficient evidence supports a conviction, an appellate court must consider " 'whether, after viewing the evidence in the light most favorable to the

---

[2] Because Baker had prior convictions with firearm enhancements, the firearm enhancements in this case were doubled pursuant to former RCW 9.94A.533(3)(d) (2020).

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Zghair, 4 Wn.3d 610, 619-20, 567 P.3d 1 (2025) (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. Circumstantial and direct evidence are equally reliable. State v. Lazcano, 188 Wn. App. 338, 363, 354 P.3d 233 (2015). Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Felony murder requires the State to prove that the defendant committed an underlying predicate crime, "and in the course of, or in furtherance of such crime or immediate flight therefrom, [they] . . . cause[d] the death of a person." RCW 9A.32.030(1)(c). The State asserted that Baker murdered Pullen "in the course of, or in furtherance of" the crime of robbery in the first degree, specifically the robbery of the Tahoe.[3]

"Chronology is important in proving that a murder was committed in the course of a felony." State v. Irby, 187 Wn. App. 183, 201, 347 P.3d 1103 (2015). "[T]o establish that a killing occurred in the course of, in furtherance of, or in the immediate flight from a felony 'there must be an intimate connection between the killing and the felony.' " State v. Hacheney, 160 Wn.2d 503, 513, 158 P.3d 1152 (2007) (quoting State v. Brown, 132 Wn.2d 529, 608, 940 P.2d 546 (1997) (internal quotation marks and footnotes omitted)).

---

[3] The State clarified that "[t]he backpack is not the item or the personal property that is the source of the robbery allegations in this case. It is the Tahoe and the Tahoe alone."

8

In Hacheney, the defendant was accused of suffocating his wife and then setting fire to the house. Id. at 505. Evidence at trial indicated the victim was dead before the defendant started the fire. Id. at 508. Regardless, a jury convicted him of murder in the first degree and returned a special verdict for aggravated murder, finding that the defendant had committed the murder "in the course of" arson in the first degree. Id. at 505-06. Our Supreme Court rejected this result, holding that "[a] person is guilty of aggravated first degree murder if the *murder* was committed 'in the course of' an enumerated *felony*, *not* if the enumerated felony is committed in the course of the murder." Id. at 518 (citations omitted) (quoting State v. Golladay, 78 Wn.2d 121, 131, 470 P.2d 191 (1970), overruled on other grounds by State v. Arndt, 87 Wn.2d 374, 553 P.2d 1328 (1976); LAWS OF 1981, ch. 138, § 2(9)). The Hacheney court reasoned, "for a killing to have occurred 'in the course of' [an enumerated crime], logic dictates that the [crime] must have begun before the killing." Id. Because evidence presented at trial indicated the victim was dead before the defendant started the fire, the murder did not occur in the course of the arson. Id. at 520.

Here, sufficient evidence supported the determination that the murder was committed in the course of the robbery of the Tahoe. Unlike the evidence in Hacheney, which indicated that the arson followed the murder, here, the evidence indicated that Baker took steps to steal the Tahoe before murdering Pullen. Video surveillance footage confirmed he acquired a gas can, filled it at a nearby gas station, and then proceeded to gas up the Tahoe. Furthermore, Baker was able to drive away almost immediately despite lacking the keys to the Tahoe, which shows he devised a method to start the vehicle before Giannini and Pullen arrived.

9

Baker argues that "the shooter was asleep in the Durango," insinuating there was some break in the chain of events and that he abandoned the robbery plan. However, the evidence does not support this theory. Giannini testified that after he confronted Castro in the Tahoe, the next thing he remembered happening was Pullen yelling there was another person in the Durango. Giannini testified he then walked from the Tahoe over to the Durango but could not see inside the Durango as he approached. At a later point, he stated someone did emerge from the Durango, the shooter. Therefore, Giannini's testimony does not definitively indicate Baker's state when he was confronted by Pullen.

Accordingly, when viewing the evidence in the light most favorable to the State, any rational factfinder could have found the murder was done in the course of, or in furtherance of, the robbery.

## II. First Aggressor Instruction

In response to Baker's self-defense claim, the State sought and the court gave a first aggressor instruction, following the standard language from Washington Pattern Jury Instructions: Criminal 16.04:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting . . . in self-defense and thereupon kill, use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense . . . is not available as a defense. Words alone are not adequate provocation for the defendant to be the aggressor.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 16.04, at 269 (5th ed. 2021). Baker contends this instruction improperly

10

nullified his alternate theory of self-defense because Pullen did not have a right to use force to recover property that did not belong to him.

When reviewing first aggressor instructions, we use the "same standards that we use to review other jury instructions." State v. Grott, 195 Wn.2d 256, 270, 458 P.3d 750 (2020). " 'Jury instructions are sufficient if they permit each party to argue [their] theory of the case and properly inform the jury of the applicable law.' " State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999) (internal quotation marks omitted) (quoting State v. Bowerman, 115 Wn.2d 794, 809, 802 P.2d 116 (1990), overruled on other grounds State v. Condon, 182 Wn.2d 307, 343 P.3d 357 (2015)).

"The basic legal principles underlying self-defense and first aggressor instructions are settled." Grott, 195 Wn.2d at 266. "The use of force is lawful and justified where the defendant has a 'subjective, reasonable belief of imminent harm from the victim.' " Id. (quoting State v. LeFaber, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 217 P.3d 756 (2009)). "The amount of force used must be 'not more than is necessary.' " Id. at 266 (quoting RCW 9A.16.020(3)).

"The evidence of self-defense must be assessed from the standpoint of the reasonably prudent person standing in the shoes of the defendant, knowing all the defendant knows and seeing all the defendant sees." Riley, 137 Wn.2d at 909. "If the defendant meets the 'initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense,' then the State has the burden to prove the absence of self-defense beyond a reasonable doubt." Grott, 195 Wn.2d at 266 (quoting Riley, 137 Wn.2d at 909, 910 n.2).

However, "the right to self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation." Riley, 137 Wn.2d at 909. The reason is that when a defendant is the aggressor, " 'the aggressor's victim, defending [them]self against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force, for self-defense.' " Grott, 195 Wn.2d at 266 (internal quotation marks omitted) (quoting Riley, 137 Wn.2d at 911). " '[A]n aggressor instruction impacts a defendant's claim of self-defense,' so 'courts should use care in giving an aggressor instruction.' " Id. at 266 (quoting Riley, 137 Wn.2d at 910 n.2). "However, first aggressor instructions 'should be given where called for by the evidence.' " Id. (quoting Riley, 137 Wn.2d at 910 n.2). Moreover, a " 'first aggressor instruction[] do[es] not actually relieve the State of its burden of proof' . . . [but] is merely 'used to explain to the jury one way in which the State may meet its burden' of disproving a claim of self-defense beyond a reasonable doubt." State v. Sanchez, 29 Wn. App. 2d 382, 392, 546 P.3d 436 (2024) (citation omitted) (quoting Grott, 195 Wn.2d at 268-69).

We review de novo whether sufficient evidence justifies an aggressor instruction. State v. Anderson, 144 Wn. App. 85, 89, 180 P.3d 885 (2008). This court engages in a "highly fact-specific inquiry" to determine if the evidence was sufficient to support giving a first aggressor instruction. Grott, 195 Wn.2d at 267. The appellate court must "view the supporting evidence in the light most favorable to the party that requested the instruction." State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). The State need only produce "some evidence" showing the defendant was the first aggressor to meets its burden of production. Riley, 137 Wn.2d at 909. A court "properly submits an aggressor instruction where (1) the jury can reasonably determine from the

evidence that the defendant provoked the fight; (2) the evidence conflicts as to whether the defendant's conduct provoked the fight; or (3) the evidence shows that the defendant made the first move by drawing a weapon." Anderson, 144 Wn. App. at 89 (citing Riley, 137 Wn.2d at 909-10). More particularly, the party seeking the instruction needs to show the provoking act was intentional and that a jury could reasonably find the act " 'would provoke a belligerent response by the victim.' " State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948 (2011) (internal quotation marks omitted) (quoting State v. Wasson, 54 Wn. App. 156, 159, 772 P.2d 1039 (1989)).

For example, in Bea, defendant Daniel Bea and his girlfriend were at a party arguing in the bathroom, and the homeowner, Carlos Cruz, asked them to leave. Id. at 573. Bea refused and held the door shut, Cruz and some friends forced the door open, and Bea and Cruz began fighting. Id. at 573-74. Bea claimed Cruz started the fight by punching him in the face. Id. at 574. The court noted that Bea was not entitled to invoke the defense of self-defense if he initiated the fight or provoked a reasonable use of force by Cruz. Id. Thus, the first aggressor instruction was properly given so that the State could argue Bea was not entitled to invoke self-defense because "he provoked a reasonable use of force by Mr. Cruz after refusing to leave the home as requested, blocking entry to the bathroom, and wreaking damage behind the closed door." Id. at 577-78.

Similarly, in Sanchez, a first aggressor instruction was proper because the defendant committed two intentional acts that a jury could reasonably find would provoke a belligerent response. 29 Wn. App. 2d at 392. Sanchez was convicted of murdering Larry Humphrey and Holger Sippach. Id. at 385. Sanchez claimed he

13

consumed methamphetamine at Humphrey's apartment and fell asleep. Id. at 386. He testified that when he woke up, Sippach was attempting to sexually assault him. Id. Sanchez believed his drugs had been spiked with gamma-Hydroxybutyric acid (GHB), a central nervous system depressant. Id. at 386 & n.1. He poured out a bottle of liquid he believed was GHB, which angered Humphrey, and a fight ensued during which Sanchez hit both men with a machete. Id. at 386. The court held that the first aggressor instruction was appropriate because a jury could find two intentional acts would provoke a belligerent response: Sanchez intentionally disposed of Humphrey's property by pouring out the GHB, and after doing so, he was told to leave but he refused. Id. at 393.

Here, Baker agrees that the first aggressor instruction is "appropriate in circumstances where a defendant has created circumstances that allow the purported victim to lawfully exercise force against him," but claims that he was defending against Pullen's *unlawful* use of force because "Pullen had no legal right to use force to recover third party property." The State counters that Pullen never used force and instead "simply walked toward the defendant trying to determine if he had more stolen items." Rather, "[i]t was the defendant who initiated the need to act in self-defense by unlawfully entering the vehicle Giannini was responsible for and stealing a backpack from inside that vehicle."

Baker relies on State v. Walther, in which the court held the defendant was not entitled to an instruction on lawful force under RCW 9A.16.020(3). 114 Wn. App. 189, 192, 56 P.3d 1001 (2002). But Walther is inapposite. The issue in Walther was whether the *defendant* was entitled to use force to protect his property.[4] By contrast, Baker did

---

[4] In Walther, the defendant had allowed his roommate to use his car, and when the roommate did not return with the car after an agreed upon time, he went searching for the car and brought a gun. 114

not request a lawful force instruction regarding his own actions; instead, he requested and received a self-defense "act on appearances" instruction. The State still had the burden to prove the absence of self-defense beyond a reasonable doubt. See Grott, 195 Wn.2d at 266.

Here, a jury could reasonably find that, viewing the evidence in the light most favorable to the State, Baker committed an intentional act that would provoke a belligerent response. When Pullen and Giannini arrived, Baker was in the Durango, a car that did not belong to him and had been left in Giannini's possession. Baker argues that he was asleep when Pullen found him, and his "action of sleeping in a car" could not have provoked a belligerent response. However, there is at least some conflicting evidence, as Giannini testified that after he found Castro in the Tahoe, Pullen shouted there was "another one over here." Giannini then walked over to the Durango and Pullen to "roust whoever it was who was also sleeping in the vehicle," but admitted that he could not see inside the Durango, only that at some point someone emerged. Video evidence showed a person with a backpack emerging out of the driver's side of the vehicle, the side opposite where Giannini and Pullen were located. Giannini testified that Pullen was on the passenger side of the car and that as he and Pullen walked toward the young man, after he emerged from the Durango, the man "was making a

---

Wn. App. at 190. He found the car with his roommate asleep inside and "pulled up behind it to block her from leaving." Id. He proceeded to pound on the car with a child-sized bat and the flat of his hand. Id. at 190-91. The roommate then woke up, started the car, and began to move the car back and forth. Id. at 191. To prevent the car from leaving, the defendant pulled out his gun and fired multiple shots. Id.

The Walther court reasoned that the defendant "was not about to be injured when he came upon [his roommate] sleeping in his parked car; thus, he was not entitled [under RCW 9A.16.020(3), which allows lawful force] to use force to prevent her from driving it away." Id. at 192. Moreover, the car was not in the defendant's "possession at the time he fired into the car . . . rather, it was in her possession." Id. Because the defendant met none of the requirements for lawful force, the court held he was not entitled to the "lawful force" instruction. Id.

motion like he had [a weapon] in his . . . breast pocket." Thus, when viewed in a light most favorable to the State, as the requestor of the first aggressor instruction, the evidence shows Baker was found in the Durango, which did not belong to him, and then emerged with a backpack that also did not belong to him. A reasonable jury could find this action to be intentional and one that could provoke a belligerent response. Thus, we conclude the court properly gave a first aggressor instruction.

### III.  Accomplice Testimony Instruction

Baker contends the court wrongly denied his request for an accomplice testimony instruction in relation to Castro's testimony. The State counters that "the instruction is required only when the testimony of the accomplice is uncorroborated," and the State "presented substantial evidence corroborating Castro's statements."

WPIC 6.05 instructs jurors on how to weigh the uncorroborated testimony of an accomplice:

> Testimony of an accomplice, given on behalf of the [State] [City] [County], should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

WPIC 6.05, at 197. Baker requested this instruction and argued that Castro was a "participant or accomplice in all of the counts" because he accompanied the shooter to the gas station and was present in the Tahoe when Pullen and Giannini arrived. The court denied the requested instruction based on its reading of the accomplice liability statute, which provides in relevant part that "a person is not an accomplice" if the person "terminates [their] complicity prior to the commission of the crime." RCW 9A.08.020(5)(b). The court reasoned that Castro terminated his aid when he fled.

16

In State v. Harris, our Supreme Court explained when WPIC 6.05 should be used:

> We hold: (1) it is always the better practice for a trial court to give the cautionary instruction whenever accomplice testimony is introduced; (2) failure to give this instruction is always reversible error when the prosecution relies solely on accomplice testimony; and (3) whether failure to give this instruction constitutes reversible error when the accomplice testimony is corroborated by independent evidence depends upon the extent of corroboration. If the accomplice testimony was substantially corroborated by testimonial, documentary or circumstantial evidence, the trial court did not commit reversible error by failing to give the instruction.

102 Wn.2d 148, 155, 685 P.2d 584 (1984), overruled on other grounds by State v. McKinsey, 116 Wn.2d 911, 914, 810 P.2d 907 (1991) (emphasis omitted).

Even if we assume without deciding that the trial court erred in issuing the instruction, Castro's testimony was substantially corroborated by the State, so any error was harmless. See In re Pers. Restraint of Sandoval, 189 Wn.2d 811, 824, 408 P.3d 675 (2018) (holding that failure to provide cautionary instruction on accomplice testimony harmless because substantial corroborating evidence was provided at trial). Baker argues that Castro's testimony "resolved the centrally disputed issue regarding the identity of the shooter." However, other evidence corroborated Castro's testimony that the shooter was Baker. Video evidence confirmed that Castro and another individual were at Storehouse the morning of the shooting and showed Castro fleeing the scene after being confronted by Giannini. Giannini's testimony corroborated that interaction. Video evidence also showed the individual with Castro take a red gas can out of the back of a vehicle, retrieve gas, and then put it in the Tahoe. The State also introduced testimony from a prior police investigation and images of Baker wearing substantially similar clothes to the individual seen with Castro, as well as Baker's

statements to Hendrix that he did not have other clothes. Finally, the State provided fingerprint evidence from the gas can recovered from the Tahoe that matched Baker's fingerprints, and DNA evidence from the steering wheel cover that provided moderate to strong support for the inclusion of Baker as a contributor to the DNA profile.

Because Castro's testimony identifying Baker as the shooter was substantially corroborated by testimonial, documentary, and circumstantial evidence, the trial court did not commit reversible error by failing to provide the cautionary accomplice instruction.

IV.  Prosecutorial Misconduct

Baker next argues that the State engaged in prejudicial misconduct by misstating the law, misstating the facts, and improperly using its rebuttal to "sandbag the defense." We disagree.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). "Prosecutorial misconduct may deprive a defendant of [their] constitutional right to a fair trial." Id. at 703-04.

If "we find that a prosecuting attorney's statements were improper, we must then determine whether the defendant was prejudiced under one of two standards of review." State v. Allen, 182 Wn.2d 364, 375, 341 P.3d 268 (2015). If the defendant made a timely objection at trial, they must demonstrate the prosecutor's improper conduct " 'resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.' " Id. (quoting State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). "If the

defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict. Id. at 760.

    A.  Misstating the Law

Baker contends that in closing, the prosecutor misstated the law on assault in the first degree. The State counters that the "prosecutor's argument . . . is well within the wide latitude given during closing argument." To convict Baker of assault in the first degree, the State needed to prove that he assaulted Giannini on or about May 3, 2022, the assault was committed with a firearm, that Baker "acted with intent to inflict great bodily harm," and that this act occurred in Washington. The jury was also instructed on the lesser crime of assault in the second degree, which required the State to prove that on or about May 3, 2022, Baker assaulted Giannini with a deadly weapon and that this act occurred in Washington. Accordingly, unlike assault in the first degree, assault in the second degree did not require the State to prove that Baker intended to inflict great bodily harm.

During closing argument, the State argued the following:

And finally, I want to talk to you about first-degree assault, which is charged in Count 5. This is Jury Instructions 23 and 24, but I want you to

pay attention to the definition of first-degree assault. It is still first-degree
assault even if someone does not get shot with a gun. *Pointing a firearm
at someone is first-degree assault because that person is being placed in
reasonable fear or apprehension that they are going to be shot.*

(Emphasis added.) Baker objected, arguing this was a misstatement of the law, and the
State responded, "It's in the jury instructions." The court then instructed the jury, "The
role of the jury will be to understand that this is argument. You need to direct yourselves
to the jury instructions." The State proceeded to argue that when the jury considered the
assault in the first degree charge, it should remember that "just seconds before" the
shooter "had killed [] Pullen, and that the first rule of responsible gun use is that you
never point a weapon at something you don't intend to destroy." It also reminded the
jury that when looking at "to convict" instructions, the jury needed to look at "all of the
elements that the State has to prove beyond a reasonable doubt in order . . . to find the
defendant guilty of these crimes."

"A prosecuting attorney commits misconduct by misstating the law." Allen, 182
Wn.2d at 373-74. This is because "[t]he jury knows that the prosecutor is an officer of
the State," State v. Warren, 165 Wn.2d 17, 27, 195 P.3d 940 (2008), and, thus, the
misstatement has a "grave potential to mislead the jury." State v. Davenport, 100 Wn.2d
757, 763, 675 P.2d 1213 (1984). "Courts review allegations of prosecutorial misconduct
during closing argument in light of the entire argument, the issues in the case, the
evidence discussed during closing argument, and the court's instructions." State v.
Rodriguez-Perez, 1 Wn. App. 2d 448, 458, 406 P.3d 658 (2017).

Because Baker timely objected, we must determine if the comment was
improper, and, if it was improper, whether it had a substantial likelihood of impacting the
verdict. Here, we agree with Baker that, viewed in isolation, the comment that "pointing

20

a firearm at someone is first degree assault" is a misstatement of the law, as it does not identify all the elements of the crime. However, even if the comment did misstate the law, Baker cannot successfully show that it had a substantial likelihood of impacting the verdict. After the close of evidence, the court read to the jury and gave them copies of instructions that correctly stated the elements the State needed to prove for assault in the first degree. And immediately following Baker's objection, the court instructed the jury that the prosecutor's statement was argument and to reference the instructions. We presume jurors follow the court's instructions. State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013). Therefore, Baker cannot satisfy his burden of showing his verdict was substantially impacted by the remark.

   B.  "Sandbagging"

   Next, Baker argues that the State undermined his right to a fair trial when it "sandbagged" the defense during the closing argument rebuttal. Baker argues that "[a] prosecutor 'sandbags' the defense when [they] hold[ ] back a critical line of argument in the first phase of [their] closing statement and unexpectedly raise[ ] a new area of argument for the first time on rebuttal, thereby depriving the defense of the opportunity to address the argument."[5] Thus, he asserts the State committed misconduct when it raised completely new arguments in its rebuttal.

   Generally, "[i]n the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.' " State v. Fisher, 165 Wn.2d 727, 747, 202

---

[5] In support of this theory, Baker cites to Howard J. Zlotnick, Structuring Rebuttal: The Anti-Sandbagging Rule, Avoiding Improper Arguments, & Crafting a Strong Rebuttal, 47 Am. J. Trial Advoc. 95, 100 (2023).

P.3d 937 (2009) (quoting State v. Gregory, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006),

overruled on other grounds by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134

(2014)). During closing argument, the State told the jury, "[y]ou have been given lesser

included offenses to consider," but that it wanted to discuss "the six charges that the

State has brought against" Baker. Baker did not explicitly discuss the lesser included

crimes in his closing argument, but he did ask the jury to find him not guilty based on

self-defense and argued that the State failed to present proof beyond a reasonable

doubt.

In rebuttal, the State again mentioned it wanted to talk to the jury "briefly about

the difference between Murder [in the second degree] and manslaughter in the first

degree." Baker objected, arguing "this is not rebuttal[]," and the court overruled the

objection. The State proceeded, stating,

> So the reason it's not manslaughter in the first degree is because there's an intent prong and a recklessness prong. So those are what has got to be going; the mental state, as we call it. It is not recklessness to point a loaded firearm at someone, put your finger on the trigger and then pull the trigger. That is intent. That is intent to murder someone for Murder 2. That is intent to do the same and assault [ ] Giannini. So that's why it's not manslaughter in the first degree and why it's a Murder 2 that I'm asking you to find guilty on.
> But as to Assault 1 and Assault 2, the main difference is going to be the added prong in Assault 1 of the intent to inflict great bodily injury or harm, whereas Assault 2 would just be pulling the firearm. And we know that this is Assault 1 and not Assault 2 because, as he's pointing that gun at [ ] Giannini, he's already killed [ ] Pullen. He's pointing that gun with the intent, and with the full-blown intent to cause great bodily injury to [ ] Giannini, who ultimately, in the face of the firearm twice, over the car and through the car, [Giannini] backs off and does not get shot.
> But you will have those instructions. Those are what we call lesser included or lesser degree, and there are instructions that you can follow if you have any questions about how to do that.

22

Baker fails to provide any Washington case law that recognizes "sandbagging" as cognizable misconduct and instead cites only out-of-state cases to support this contention.[6] Here, the State argued in both its initial closing argument and in rebuttal that it had met its burden showing that Baker was guilty of the greater crimes it charged. Thus, especially given Baker's argument that the State had not met its burden, the State could reasonably extend its argument to distinguish between the lesser included charges. Doing so was not misconduct.

Moreover, even if we were to find misconduct, the rebuttal argument was not so prejudicial that it substantially impacted the outcome of the case. See State v. Carte, 27 Wn. App. 2d 861, 874, 534 P.3d 378 (2023) (While remarks made in rebuttal are more likely to create prejudice, "this alone is insufficient to create incurable prejudice."). And here, the court instructed the jury,

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence . . . . You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

Again, because we presume the jury follows instructions, Baker fails to meet his burden of showing substantial prejudice from the State's rebuttal argument.

---

[6] See Bailey v. State, 440 A.2d 997, 1003 (Del. 1982) (reasoning that State "sandbagged" defense when it referred to testimony of numerous witnesses not addressed by defense and raised novel questions about how police handled the investigation); U.S. v. Taylor, 728 F.2d 930, 937 (7th Cir. 1984) (holding prosecutor's remarks were improper when they discussed particular points of testimony that defense did not address); Jenner v. Leapley, 521 N.W.2d 422, 429 (S.D. 1994) (holding State's remarks were improper because it went beyond the scope of defense's final summation).

C. Misrepresented Facts

Finally, Baker argues that the State committed misconduct when it "misrepresented facts" by making a "wholly inappropriate" objection to a portion of his argument in closing. We disagree.

Castro testified that he initially provided the name "Shane" and at least two different last names to police.[7] Castro also agreed that during the June 2022 meeting, he finally stated to police that he was with a "Shane Baker." On cross-examination, he acknowledged that he had watched the news the day before the interview that included a "story about someone named Shayne Baker." Baker had successfully obtained a pretrial ruling from the court suppressing discussion of Baker's prior convictions, including evidence that the news story concerned his arrest in association with other murders. Thus, Baker was permitted to elicit testimony from Castro that he had seen the news the day before but could not elicit testimony about why Baker was on the news.[8]

The following exchange took place when Baker attempted to discredit Castro in closing:

> [Defense counsel:] They have an eyewitness named Eli Castro . . . . This was an eyewitness participant who was threatened by police, threatened with charges multiple times and eventually given immunity as soon as he said what they wanted him to say. He walked out of there with no responsibility whatsoever for the events of May 3rd.
> And this was the eyewitness participant who only named Shayne Baker when he was called back for a second interrogation, who was told

---

[7] As noted above, the evidence at trial was that Castro provided police with three last names for "Shane": Dahl, McDougal, and Goodall.

[8] Out of the presence of the jury, in a discussion about this line of questioning, defense counsel explained,

> The issue is whether or not Mr. Castro's memory was tainted by what he saw on the news. . . . [F]irst he denied watching the news, but then he admitted to watching it just the day before. . . . [T]his is a fair line of questioning to show why Mr. Castro suddenly came up with the name Baker, which is that he heard it on the news the day before [he was questioned by detectives].

24

to stop the bullshit. And this eyewitness participant, Eli Castro, named Shayne Baker *only after Eli had seen the news the day before, news that reported about an arrest of someone named Shayne Baker* and showed his picture on TV screens around the Seattle area.

[State]:   Objection.

The Court:   Sorry. I heard the objection. Please continue.

[State]:   Facts not in evidence.

The Court:   That's true.

[Defense counsel]:   Your Honor, Eli Castro testified that he'd seen the news the day before.

[State]:   Your Honor, the objection is to [defense counsel] summarizing what she believes that Mr. Castro had seen.

[Defense counsel]:   Your Honor, his testimony was that he had actually seen news of Shayne Baker.

The Court:   That's not my recollection. I will sustain the objection.

(Emphasis added.)

Baker frames the State's objection as misconduct. A prosecutor commits misconduct when they urge the jury to decide a case based on evidence outside the record. See, e.g., State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). However, Baker fails to provide an example or authority that supports his argument that a prosecutor commits this type of misconduct simply by lodging an objection. Therefore, we need not address this argument. See Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

Regardless, the State appropriately objected to Baker's argument that included information about him being arrested, as this information was not elicited during

Castro's testimony, in keeping with the pretrial ruling. Accordingly, the State did not engage in misconduct by properly objecting to the statement as a "fact not in evidence."

V. Comment on the Evidence

Baker also argues this court should reverse his convictions because during the same exchange set out above regarding whether Castro saw news of Baker's arrest, the court made an "inappropriate and incorrect comment regarding a key witness's testimony." He claims that the trial court thereby unduly infringed on his right to present his closing argument. We disagree.

Under our state constitution, "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. Accordingly, our state constitution explicitly prohibits judicial comments on the evidence. State v. Levy, 156 Wn.2d 709, 719-20, 132 P.3d 1076 (2006).

"A statement by the court constitutes a comment on the evidence if the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement." State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995). This is so because

> "it is a fact well and universally known by courts and practitioners that the ordinary juror is always anxious to obtain the opinion of the court on matters which are submitted to [its] discretion, and that such opinion, if known to the juror, has a great influence upon the final determination of the issues."

State v. Bogner, 62 Wn.2d 247, 249, 382 P.2d 254 (1963) (quoting State v. Crotts, 22 Wash. 245, 250, 60 P. 403 (1900)). However, "the court does not comment on the evidence simply by giving its reasons for its ruling." State v. Dykstra, 127 Wn. App. 1, 8, 110 P.3d 758 (2005). As an initial matter, while the State objected to Baker's argument,

Baker did not object to the court's comments during that exchange. Although this court "may refuse to review any claim of error which was not raised in the trial court," a party may raise for the first time on appeal an assignment of error that concerns a "manifest error affecting a constitutional right." RAP 2.5(a). To satisfy these requirements, the appellant must show that the error is truly of constitutional magnitude and, if so, that the error is manifest. State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). Manifestness requires a plausible showing of actual prejudice, meaning " 'the asserted error had practical and identifiable consequences in the trial of the case,' " and "the error is so obvious on the record that the error warrants appellate review." State v. O'Hara, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009) (internal quotation marks omitted) (quoting State v. Kirkman, 159 Wn.2d 125, 935, 155 P.3d 125 (2007)).

While a court's comment on evidence is an error of constitutional magnitude, Baker does not provide analysis or argument as to how the claimed error is manifest and warrants our review under RAP 2.5(a), other than a conclusory statement that "[i]t is particularly appropriate for an appellant to raise this issue for the first time on appeal when the comment 'goes to the essence of the accused's defense.' "[9] Instead, Baker addresses the merits, citing to Lane, to argue that the trial court commented on the evidence when it told the jury to "disregard a disputed fact that affects a key witness's credibility."

In Lane, the court commented on a disputed fact that improperly removed the issue from the jury's determination. 125 Wn.2d at 837. At trial, the State introduced witness testimony about statements made by the defendants while jailed together that

---

[9] Appellant's Brief at 54 (quoting State v. Painter, 27 Wn. App. 708, 715, 620 P.2d 1001 (1980)).

supported an element of the charged crime. Id. at 835-36, 839. The witness had been released early from jail. Id. at 836. The defense asserted that his sentence reduction was granted in exchange for his testimony, while the State argued that "his sentence was reduced to protect his safety because word had spread in the jail that [the witness] was cooperating with the police." Id. The court discussed the testimony, stating,

> The sentence of [the witness] was reduced to three months confinement . . . . The reasons advanced by the prosecutor *and accepted by the judge* related to [the witness's] safety and an inadvertent disclosure near [sic] of [the witness's] cooperation with authorities given to an unidentified person. Whether that last statement proves or does not prove anything is a matter for the jurors.

Id. at 837 (emphasis added). Our Supreme Court determined that the trial court impermissibly commented on the evidence when it made those remarks. Id. at 838. It reasoned that by making this statement to the jury regarding the reason for the witness's sentence reduction, the trial judge "charged the jury with a fact and expressly conveyed his opinion regarding the evidence." Id. at 839.

Unlike the court's explicit remarks to the jury in Lane, the court here neither resolved a disputed fact nor expressly indicated its opinion regarding the evidence. After the State objected to defense counsel's argument that mentioned Baker's arrest as "facts not in evidence," the court stated, "That's true," and "That's not my recollection," without identifying what facts were not in evidence or what the word "that" referred to. Furthermore, the court referenced its recollection of Castro's testimony only for the purpose of ruling on the State's objection that defense counsel's argument referenced facts not in evidence—i.e., went beyond Castro's testimony.

Moreover, Baker fails to make a plausible showing that the asserted error had practical and identifiable consequences in the trial, as required to demonstrate manifest

28

error under RAP 2.5(a). While the report of proceedings does not indicate the precise timing, it reflects that during the colloquy about the State's objection to defense counsel's argument, the State, defense counsel, and the court each took care to avoid directly stating the prohibited information—i.e., that Baker was on the news because he had been arrested for different murders. Thus, while the parties and the court could understand that the court's use of "that" referred to defense counsel's characterization of the evidence based on their prior discussions about this issue, the jury likely would not have so understood.

Further, the judge instructed the jury before opening statements to disregard its rulings as personal opinion about the "value of a particular witness's testimony or an exhibit." The court also provided instructions to this effect, stating,

> Our state constitution prohibits a trial judge from making a comment on the evidence. It would be improper for me to express, by words or conduct, my personal opinion about the value of testimony or other evidence. I have not intentionally done this. If it appeared to you that I have indicated my personal opinion in any way, either during trial or in giving these instructions, you must disregard this entirely.

We presume jurors will follow the court's instructions, Dye, 178 Wn.2d at 556, and Baker fails to overcome the presumption. Thus, he fails to establish the court's comment constituted manifest constitutional error under RAP 2.5(a)(3) and we therefore decline to address the issue on that basis.

## VI.  Restriction of Baker's Closing Argument

Baker makes a third claim of error based on the same exchange during Baker's closing argument set out above. He argues that the court's comment that a detail was not a part of its "recollection," as well as the ruling sustaining the State's assertion that

29

Baker's arrest was a fact not in evidence, "inappropriately restricted the scope of [his] closing argument." We disagree.

"This court reviews a trial court's action limiting the scope of closing argument for abuse of discretion." State v. Frost, 160 Wn.2d 765, 771, 161 P.3d 361 (2007). A court abuses its discretion " 'only if no reasonable person would take the view adopted by the trial court.' " State v. Perez-Cervantes, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000) (emphasis omitted) (quoting State v. Huelett, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979)).

"It is well established that trial courts possess broad discretionary powers over the scope of counsel's closing arguments." Frost, 160 Wn.2d at 771-72. Furthermore, our Supreme Court has emphasized that "the trial court should 'in all cases . . . restrict the argument of counsel to the facts in evidence.' " Perez-Cervantes, 141 Wn.2d at 475 (quoting Sears v. Seattle Consol. C.S. Ry., 6 Wash. 227, 233, 33 P. 1081 (1893)).

Here, the trial court appropriately restricted the argument to the facts in evidence. The court permitted Baker to argue that evidence supported his theory that Castro identified him because Castro had seen him on the news shortly before being interviewed by police. Therefore, the trial court did not abuse its discretion when it limited Baker's closing argument concerning the topic of his arrest in association with the news story Castro saw.

VII.  Cumulative Error

Finally, Baker argues that cumulative error deprived him of his right to a fair trial. "Under [the] cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." Emery, 174 Wn.2d at

30

766. Because we recognize only one error—the State's misstatement of law—but conclude the claim is unsuccessful because he cannot show prejudice, Baker fails to show he is entitled to a new trial under the cumulative error doctrine.

VIII.  Double Jeopardy

Baker argues that this court should reverse and remand for resentencing because his two murder convictions for a single homicide—felony murder in the first degree and murder in the second degree—violate his right to be free from double jeopardy. The State concedes that "double jeopardy prevents entering judgment for both first degree felony murder and second degree murder of the same victim." We accept the concession.

The jury found Baker guilty of both felony murder in the first degree and murder in the second degree for the killing of Pullen. At sentencing, the court agreed that the two convictions constituted the "same criminal conduct" as defined in RCW 9.94A.589(1)(a). Accordingly, the court did not vacate the murder in the second degree conviction and did not apply a sentence to the conviction, but it did impose 120 months due to a firearm sentencing enhancement.

We review double jeopardy claims de novo. State v. Kier, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). Both the federal and state constitutions prohibit multiple punishments for the same offense. See id. at 803; WASH. CONST. art. I, § 9 ("No person shall . . . be twice put in jeopardy for the same offense."); U.S. CONST. amend. V ("No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."). Washington follows the "same evidence" rule, which holds that "the defendant's double jeopardy rights are violated if he or she is convicted of offenses that

31

are identical both in fact and in law." State v. Calle, 125 Wn.2d 769, 777, 888 P.2d 155 (1995). Generally, offenses are not the same in law " 'if there is any element in one offense not included in the other and proof of one offense would not necessarily prove the other.' " State v. Womac, 160 Wn.2d 643, 652, 160 P.3d 40 (2007) (quoting State v. Trujillo, 112 Wn. App. 390, 410, 49 P.3d 935 (2002)). However, our Supreme Court has "occasionally found a violation of double jeopardy despite a determination that the offenses involved clearly contained different legal elements." Id. (emphasis omitted). This exception has included convictions for murder, as "the legislature did not intend to provide multiple punishments for a single homicide." State v. Schwab, 98 Wn. App. 179, 188-89, 988 P.2d 1045 (1999) (holding "convictions for both second degree felony murder and first degree manslaughter for a single homicide violate state and federal constitutional guarantees against double jeopardy").

Here, the crimes of felony murder in the first degree and murder in the second degree are not identical. Compare RCW 9A.32.030(1) ("A person is guilty of murder in the first degree when: . . . (c) [They] commits or attempts to commit the crime of . . . robbery in the first or second degree."), with RCW 9A.32.050(1) ("A person is guilty of murder in the second degree when:  . . . (b) [They] commits or attempts to commit any felony, including assault . . . and, in the course of and in furtherance of such crime . . . causes the death of a person."). However, both convictions concern the death of a single individual, Pullen. Because "one killing equals one homicide," Womac, 160 Wn.2d at 655, Baker's convictions for both murder charges violate double jeopardy.

"When a conviction violates double jeopardy principles, it must be wholly vacated." In re Pers. Restraint of Strandy, 171 Wn.2d 817, 819, 256 P.3d 1159 (2011);

32

see Womac, 160 Wn.2d at 659-660. "[T]he proper remedy is to vacate the lesser conviction and remand for resentencing on the remaining conviction." State v. League, 167 Wn.2d 671, 672, 223 P.3d 493 (2009). Furthermore, if an offense is vacated and the defendant is not sentenced for it, RCW 9.94A.533 does not provide a basis for imposing a term for the corresponding firearm enhancement. State v. Davis, 177 Wn. App. 454, 465 n.10, 311 P.3d 1278 (2013) (citing former RCW 9.94A.533(3)(e) (2020) (making firearm enhancements mandatory "for all offenses sentenced under this chapter")).

The lesser conviction is murder in the second degree. See RCW 9.94A.515.[10] Accordingly, we reverse and instruct the trial court to vacate the murder in the second degree conviction and the accompanying firearm enhancement.

## CONCLUSION

We reverse the conviction for murder in the second degree and the imposition of the associated firearm enhancement and remand for resentencing consistent with this opinion. We otherwise affirm the judgment and sentence.

_Chung, J._

WE CONCUR:

_Feldman, J._                    _Smith, J._

---

[10] Although RCW 9.94A.515 has been amended multiple times since the events at issue, the amendments did not change any language applicable to this analysis; therefore, we cite to the current statute.